EXHIBIT 1

COMPLAINT FILED IN U.S. BANKRUPTCY COURT

JOSEPH W. ANTHONY (MN #2872)
MARY L. KNOBLAUCH (MN #159645)
**ANTHONY OSTLUND BAER**
**& LOUWAGIE P.A.**
3600 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone: (612) 349-6969
Facsimile: (612) 349-6996
Email: janthony@aoblaw.com
        mknoblauch@aoblaw.com

*Counsel to Ad Hoc Group of Class B Unit*
*Holders*

RONALD A. BENDER (MT #106)
MATTHEW J. CUFFE (MT #4448)
**WORDEN THANE P.C.**
Attorneys at Law
P.O. Box 4747
Missoula, MT 59806
Telephone: (406) 721-3400
Facsimile: (406) 721-6985
Email:   rbender@wthlaw.net
         mcuffe@wthlaw.net

*Counsel to Ad Hoc Group of Class B Unit*
*Holders*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re:<br><br>**YELLOWSTONE MOUNTAIN CLUB, LLC, et al.,**<br><br>Debtors, | Case No. 08-61570-11-RBK<br><br>Jointly Administered with 08-61571 and 08-61572, 08-61573<br><br>Chapter 11 |
| **Michael Snow, Greg C. Branch, A.C. and Linda Markkula (Trustees of the Arlin Trust), Spano Yellowstone Holdings Limited Partnership, Robert P. and Katharine M. Watson, Bankers Financial Corporation and Mountain Vista Properties AG,**<br><br>Plaintiffs,<br><br>vs.<br><br>**BLX Group, Inc., f/k/a/ Blixseth Group, Inc., Timothy L. Blixseth, Edra D. Blixseth, John Does 1-15, and ABC Companies 1-15.**<br><br>Defendants. | <u>**COMPLAINT**</u><br>**(EQUITABLE SUBORDINATION; BREACH OF CONTRACT; TORTIOUS INTERFERENCE WITH CONTRACT; BREACH OF FIDUCIARY DUTY; BREACH OF DUTY OF CARE; BREACH OF OBLIGATION OF GOOD FAITH AND FAIR DEALING; AIDING AND ABETTING; ALTER EGO; CONVERSION; ACCOUNTING; UNJUST ENRICHMENT; CONSTRUCTIVE TRUST; INJUNCTIVE EQUITABLE RELIEF; CONSPIRACY; ATTORNEYS' FEES; PUNITIVE DAMAGES)**<br><br>Adv. Pro. No. _____<br>Judge: Ralph B. Kirscher |

Plaintiffs Michael Snow, Greg C. Branch, A.C. and Linda Markkula (Trustees of the
Arlin Trust), Spano Yellowstone Holdings Limited Partnership, Robert P. and Katharine M.
Watson, Bankers Financial Corporation and Mountain Vista Properties BG (collectively, "the
B Members" or "Plaintiffs"), by and through their undersigned counsel, herein states their causes
of action and claims for relief against Defendants BLX Group, Inc. f/k/a Blixseth Group, Inc.
("BGI"), Timothy L. Blixseth ("Mr. Blixseth"), and Edra D. Blixseth ("Ms. Blixseth"; together
with Mr. Blixseth, the "Blixseths").

## INTRODUCTION

1.      The Debtors, Yellowstone Mountain Club, LLC and Yellowstone Development
Company, LLC, own and operate the Yellowstone Club which is one of Montana's most
spectacular ski and golf resort communities.

2.      Plaintiffs are Class B Members of the Debtors and together hold a 7.1428% equity
interest in the Debtors.

3.      BGI, a company that has always been owned and controlled by Timothy and Edra
Blixseth, owns an 82% equity interest in the Debtors. BGI has always been the sole manager of
the Debtors.

4.      By their conduct described more fully herein, BGI and the Blixseths breached
fiduciary duties owing to Plaintiffs and committed other serious wrongdoing, causing significant
harm and damages to Plaintiffs – the ultimate consequence of which is Plaintiffs are at risk of
having their equity interests completely eliminated as part of the Debtors' plan of reorganization.

5.      In 2005, the Blixseths caused the Debtors to borrow $375 million pursuant to a
"Credit Agreement" with Credit Suisse, Cayman Islands Branch ("Credit Suisse"). A significant
portion of the loan proceeds were earmarked for distributions to the owners of the Debtors.

2

Instead of making any distributions to Plaintiffs, nearly all of the Credit Suisse loan proceeds were wrongfully distributed to BGI or the Blixseths personally. The Blixseths orchestrated this by way of purported "loans" from the Debtors to BGI and Yellowstone Club World LLC ("YCW"), another entity owned and controlled by the Blixseths which recently sought Bankruptcy protection. Ultimately, BGI and YCW and other unknown entities ended up with over $300 million of the Credit Suisse loan proceeds.

6.      A central issue in this Court is whether the Debtors are entitled to recover the purported "loans" made to BGI and YCW. The Official Committee of Unsecured Creditors (the "Committee") has commenced an adversary proceeding against Edra Blixseth and BGI, seeking to collect on three promissory notes purportedly evidencing "loans" from the Debtors to BGI. The Committee also seeks to enjoin Edra Blixseth from further encumbering assets acquired or maintained with the Credit Suisse loan proceeds. Finally, the Committee has received authorization from this Court to sue Credit Suisse to avoid the Credit Suisse loan as a fraudulent conveyance.

7.      The Debtors' plan of reorganization recently filed in *In re Yellowstone Mountain Club, LLC, Yellowstone Development Company, LLC, and Big Sky Ridge, LLC*, procedurally consolidated under case number 08-61570, currently pending in this Court (the "Bankruptcy Cases") provides for these adversary proceedings and potentially other derivative claims belonging to the Debtors relating to the Credit Suisse loan proceeds to continue to be litigated after confirmation in a liquidation trust.

8.      In this Complaint, Plaintiffs claim they are entitled to a portion of the Credit Suisse loan proceeds and other amounts which is or may be subject to claims by the Debtors. Specifically Plaintiffs allege that Edra Blixseth, Tim Blixseth and BGI breached their fiduciary duties and committed other wrongdoing by making distributions to themselves of the Credit

3

Suisse loan proceeds without making pro rata distributions to Plaintiffs as Class B members. The issues presented by these personal claims are related both to the estate claims asserted in the adversary proceedings by the Committee and to the Bankruptcy Cases generally.

## PARTIES

9.     Plaintiffs each own a 1.0204% interest in both Yellowstone Mountain Club, LLC ("YMC") and Yellowstone Development, LLC ("YD") (collectively, the "Yellowstone LLCs"). Plaintiffs are each Class B Members of the Yellowstone LLCs. Together Plaintiffs own 7.1428% of the Yellowstone LLCs. In addition to their ownership interest in the Yellowstone LLCs, each of the Plaintiffs own residential property at the Yellowstone Club and are Pioneer members of the Yellowstone Club.

10.     Defendant BGI is an Oregon corporation. BGI is the sole manager of the Yellowstone LLCs. BGI and Blixseth Family Investments, LLC ("BFI") are the sole Class A members in the Yellowstone LLCs. BGI owns 82% of the Yellowstone LLCs. BFI owns 6.0204% of the Yellowstone LLCs and is wholly-owned by Ms. Blixseth.

11.     As the manager of the Yellowstone LLCs, BGI owes each of the Plaintiffs a fiduciary duty.

12.     As the majority owner of the Yellowstone LLCs, BGI owes each of the Plaintiffs a fiduciary duty.

13.     Defendant Timothy L. Blixseth is a resident of the State of Washington. As stated by Mr. Blixseth in pleadings in this Court (Docket No. 359), he was the founder and former managing member of the Yellowstone LLCs. Until July or August 2008, Mr. Blixseth was the Chief Executive Officer of the Yellowstone LLCs.

14.     Defendant Edra D. Blixseth is a resident of the State of California. Until about January 2007, Ms. Blixseth was the Chief Operating Officer of the Yellowstone LLCs.

4

15.    The Blixseths formed Yellowstone Club World LLC ("YCW"), a Washington State limited liability company, to be an exclusive membership club offering, according to its former website "an unusual recreational access to [the] finest amenities, activities and services in the most exclusive locations around the globe." YCW is now defunct and recently sought Bankruptcy protection.

16.    Mr. Blixseth also holds a 50% interest in Big Sky Ridge, LLC ("BSR") and YD holds the other 50%. Plaintiffs, through their ownership in YD, also own a portion of BSR. Mr. Blixseth formed BSR primarily as a land-holding venture for land contiguous with the Yellowstone Club.

17.    Together, the Blixseths were the controlling shareholder of BGI and YCW. As such, the Blixseths controlled BGI, the Yellowstone LLCs, and YCW. In particular, there was no difference between BGI and the Blixseths personally, other than the corporate structure.

18.    Because the Blixseths together were the controlling shareholder of BGI which is the manager and majority owner of the Yellowstone LLCs, the Blixseths owed a fiduciary duty to each of the Plaintiffs.

19.    Since July or August of 2008, upon her divorce from Mr. Blixseth, Ms. Blixseth alone has been the controlling shareholder of BGI which has continued to manage the Yellowstone LLCs. Ms. Blixseth continues to owe a fiduciary duty to each of the Plaintiffs.

20.    As officers of the Yellowstone LLCs, the Blixseths owed a fiduciary duty to each of the Plaintiffs.

21.    John Does 1-15 and ABC Companies 1-15, the identities of which are now unknown to Plaintiffs, aided and abetted in the breaches of duty complained of herein and also have been unjustly enriched to the detriment of the B Members. In particular, on information and belief, certain entities and individuals involved in the disbursement of the Credit Suisse loan

5

proceeds knowingly assisted BGI and the Blixseths in the breaches and other wrongdoing complained of herein to the detriment of the B Members.

## JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b). This is a civil proceeding arising under Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, or arising in or related to cases under Title 11, namely *In re Yellowstone Mountain Club, LLC, Yellowstone Development Company, LLC, and Big Sky Ridge, LLC,* procedurally consolidated under case number 08-61570, currently pending in this Court (the "Bankruptcy Cases"). Count 1 of this Complaint for equitable subordination of the claims and interests of BGI and Edra Blixseth to the claims and interests of Plaintiffs arises under 11 U.S.C. § 510(c). The remainder of the state law claims set forth herein are related to the Bankruptcy Cases within the meaning of 28 U.S.C. § 1334(b).

23. This proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b). In particular, this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B) & (O).

24. Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

## GENERAL ALLEGATIONS

### A. The Formation of the Yellowstone LLCs.

25. The Blixseths conceived and developed the Yellowstone Club.

26. The Yellowstone Club is a 13,500 acre exclusive membership resort comprising, among other things, a 2,200 acre private ski resort, a championship golf course, second homes, sold lots awaiting development, unsold platted and unplatted inventory land, and the 125,000 square foot Warren Miller Lodge.

27. At one time, the Yellowstone Club was not much more than undeveloped land in an attractive part of the world. In 1999 three-time Tour de France winner Greg LeMond as well

6

as others, including Michael Snow and other of the Plaintiffs, committed to invest millions of dollars in the Yellowstone Club and to become Yellowstone Club members. Subsequently, several other investors committed to become Yellowstone Club members.

28.     In exchange for their investment of millions of dollars, each of the Plaintiffs became Pioneer members and later paid additional amounts to receive a 1.0204% equity interest in the Yellowstone LLCs and become a Class B member of the companies.

29.     Mr. Blixseth, on behalf of the Yellowstone LLCs, entered into and signed Subscription Agreements with each B Member which specifically describes and limits the business of the Yellowstone LLCs to the ownership and operation of a private membership club in the State of Montana. Nothing in the Subscription Agreements authorized the Blixseths to transform the Yellowstone LLCs into a bank to finance their own personal interests or into a worldwide time-share venture – which is exactly what the Blixseths did beginning in 2005 and continuing until just recently when their activities forced the Yellowstone LLCs to seek Bankruptcy protection.

22.     Each of the Yellowstone LLCs is governed by an Operating Agreement. Although Article 6 of the Operating Agreements for the Yellowstone LLCs gave the Members' rights to information regarding the LLCs, despite repeated requests, BGI and the Blixseths never made available to the B Members the information needed to sufficiently analyze the Yellowstone LLCs' finances.

**B.     BGI's 2005 Offer to Purchase Plaintiffs' Interests in the Yellowstone LLCs and Plaintiffs' Attempts to Access Information About the Yellowstone LLCs' Finances.**

23.     On May 25, 2005, BGI, through Mr. Blixseth, wrote the Yellowstone LLCs' Class B unit holders and offered to purchase their interests in the Yellowstone LLCs.

24. The offer effectively gave the B Members two weeks to accept the offer. According to BGI and Mr. Blixseth, the decision to offer to purchase the B Members' interest was characterized as a "spur of the moment" decision to "try and own 100% of his [Blixseth's] dream." Mr. Blixseth informed the B Members that he intended to obtain "a financing" to purchase the B Members' interests and that he would "take this financing on only if I can reacquire all of the outstanding B shares." Mr. Blixseth did not mention the amount of the financing nor the bank that he intended to use.

25. Mr. Blixseth's offer included a cash and property component which, according to him, was worth $3.25 million to each B Member. BGI and Mr. Blixseth characterized BGI's May 2005 offer as a "decent and fair offer" and a "tremendous offer."

26. To evaluate BGI's offer, the B Members subsequently unsuccessfully sought to obtain from BGI and the Blixseths financial information about the Yellowstone LLCs. BGI and the Blixseths either ignored, stonewalled or refused repeated requests for financial information.

27. At the time, BGI and the Blixseths knew that each 1% equity interest in the Yellowstone LLCs was worth far greater than $3.25 million. Based upon appraisals that were done at that time, each 1% equity interest in the Yellowstone LLCs was worth at least $11.6 million, many times greater than the offer made to the B Members.

28. Eventually, in November 2005, Mr. Blixseth revoked BGI's offer.

29. The B Members did not learn until much later why Mr. Blixseth changed course and revoked BGI's offer.

8

**C.  The Blixseths Encumber the Yellowstone LLCs to Provide Themselves
Distributions in Excess of $300 Million to the Exclusion of the B Members.**

30.     Well after the fact, the B Members learned that BGI and the Blixseths caused the

Yellowstone LLCs and BSR to borrow $375 million pursuant to a "Credit Agreement" with

Credit Suisse dated September 30, 2005.

31.     Mr. Blixseth signed the Credit Agreement on behalf of the Yellowstone LLCs and

BSR and caused the Yellowstone LLCs and BSR to pledge nearly all of their assets as collateral

for the $375 million loan.

32.     The Credit Agreement explicitly provided that $351 million of the $375 million

loan (93.6% of the proceeds) could be used for purposes unrelated to the Yellowstone LLCs.  In

particular, Section 2.6 of the Credit Agreement stated that $209 million of the loan proceeds

were for "for distributions or loans." Further, in confidential presentations made by the Blixseths

immediately preceding the closing on the loan, they stated that a large portion of the loan would

be used for the "Return of Capital" – that is, a simple distribution of funds to the owners of the

Yellowstone LLCs.  Several documents relating to the loan stated that the "return of capital" was

intended to provide a distribution to *owners, principals* and *shareholders*.

33.     Instead of making any distributions to the B Members, nearly all the loan

proceeds were distributed to BGI or the Blixseths personally in violation of Article 7 of the

Operating Agreements.

**D.     The $209 Million "Loan" from YMC to BGI.**

34.     The first $209 million of the loan that was made to YMC was then purportedly

"loaned" to BGI pursuant to a promissory note bearing the date of September 30, 2005.

Mr. Blixseth was on both sides of this transaction, he signed the promissory note – which was

simply a demand note.  BGI did not pledge any collateral, commit any future earnings or provide

9

any guarantees for the $209 million "loan." The Blixseths never intended for the loan to BGI to be collectable or collected. It was back-dated and made to disguise the fact that the Blixseths were in fact distributing a dividend to themselves.

35. On information and belief, the vast majority of this $209 million "loan" to BGI did not find its way to any BGI account. Instead, on information and belief, the Blixseths caused the $209 million to be sent to 20 different destinations as follows:

     a.    $25,000,000 certificate of deposit at First Bank in BGI's name.

     b.    $11,939,495 payoff to First Bank for the Blixseths' primary residence at Porcupine Creek in Rancho Mirage, California.

     c.    $17,000,000 certificate of deposit at Palm Desert National Bank in the Blixseths' name.

     d.    $14,016,227.87 deposit into a money-market account at Palm Desert National Bank in Mr. Blixseth's name.

     e.    $4,133,623.50 payoff to Palm Desert National Bank for the following debts:

          (1)   $3,169,118.75 for charges related to "Desert Ranch," the Blixseths' personal housing development near Palm Springs, California.

          (2)   $79,629.54 payoff of "Edra's Condo," a condo owned by Ms. Blixseth in Palm Desert, California.

          (3)   $402,546.02 payoff of the Blixseths' personal line of credit.

          (4)   $482,329.19 payoff of Ms. Blixseth's personal line of credit.

     f.    $15,000,000 certificate of deposit at Jackson State Bank in Mr. Blixseth's name.

     g.    $3,068,749.99 payoff to American Bank for personal uses.

     h.    $975,908.57 payoff to American Bank for personal uses.

     i.    $1,515,250 payoff to American Bank for personal uses.

     j.    $896,423.28 payoff to American Bank for personal uses.

     k.    $977,894.92 payoff to American Bank for personal uses.

l.    $100,000,000 certificate of deposit at U.S. Bank in the Blixseths' name.

m.   $5,000,000 certificate of deposit at Pacific Western Bank in the Blixseths' name.

n.    $2,971,443.02 payoff of a personal note to Pacific Western Bank.

o.    $160,765.83 payoff to Union Bank for a rental home owned by Blixseth.

p.    $2,007,930.55 payoff to Commercial Bank for personal uses.

q.    $1,403,547 payoff to GECC for an airplane owned by a Blixseth-owned company in which neither YMC nor YD have an interest.

r.    $2,484,774 payoff to GECC for an airplane owned by a Blixseth-owned company in which neither Yellowstone Mountain Club nor Yellowstone Development have an interest.

s.    $272,590 payoff to World Savings for a rental home owned by the Blixseths.

36.    Article 7 of the Operating Agreements generally provides, with certain irrelevant exceptions, that all distributions/allocations to Members must be allocated among the Members *pro rata* in proportion to a Member's percentage ownership in the respective Yellowstone LLC.

37.    BGI and the Blixseths violated the provisions of Article 7 of the Operating Agreements by providing BGI, and BGI alone, with the $209 million "return of capital" distribution. This distribution, according to Article 7 of the Operating Agreements, was required to be allocated among the Yellowstone LLCs' Members *pro rata* in proportion to the Members' percentage ownership in the Yellowstone LLCs.

## E.    The Blixseths Used $108 Million of the Loan Proceeds to Purchase Property All Around the World.

38.    On October 1, 2005, the day after the $375 million loan was funded by Credit Suisse, Mr. Blixseth executed a "Five-Party Agreement" on behalf of YMC, YD, BSR, YCW and BGI that required the Yellowstone LLCs and BSR to invest up to $142 million in one or more resort locations identified by YCW.

11

39.     In connection with this Five-Party Agreement, on information and belief,

approximately $133 million of the loan proceeds were disbursed to YD as follows:

> a.    $100 million was placed in a six-month certificate of deposit at U.S. Bank in YD's name;
>
> b.    $30 million was placed in a six-month certificate of deposit at American Bank in YD's name; and
>
> c.    $3,110,262.53 remained in YD's checking account, although at least $225,000 of those funds was used for marketing YCW.

40.     On information and belief, after the CDs above matured, the Blixseths used

$108 million of the $133 million to purchase three resorts and an island located outside the

United States:

> a.    $28 million was used to purchase Chateau de Farcheville located in France;
>
> b.    $40 million was used to purchase a resort known as Tamarindo located in Mexico;
>
> c.    $28 million was used to purchase a private island in Turks & Caicos; and
>
> d.    $12 million was used as down payment for property at St. Andrews located in Scotland.

41.     The Tamarindo and Turks & Caicos properties are owned outright by

Mr. Blixseth personally.

42.     The Farcheville and St. Andrews properties are purportedly currently owned

indirectly by YMC, YD or BSR. However, on information and belief, the Blixseths have

distributed to themselves a significant portion of equity or value that otherwise would be held in

these properties.

43.     The Blixseths' use of $108 million of the loan proceeds to purchase real estate

around the world for their own personal benefit was an improper distribution that violated the

provisions of Article 7 of the Operating Agreements. This distribution, according to Article 7 of

12

the Operating Agreements, was required to be allocated among the Yellowstone LLCs' Members *pro rata* in proportion to the Members' percentage ownership in the Yellowstone LLCs.

44.     The location and disposition of the remaining $25 million (i.e. $133 million minus $108 million = $25 million) is uncertain.  To the extent the Blixseths used these funds in the same or similar manner that they used the $108 million, this is an additional improper distribution that violated the provisions of Article 7 of the Operating Agreements because it was not allocated among the Yellowstone LLCs' Members *pro rata* in proportion to the Members' percentage ownership in the Yellowstone LLCs.

**F.     Apart from the Improper Distributions Relating to the Credit Suisse Loan, BGI and the Blixseths Improperly Received an Additional $64.5 Million in Distributions from the Yellowstone LLCs.**

45.     In a promissory note bearing the date of September 30, 2005, Mr. Blixseth memorialized an alleged "loan" from YD to BGI in the amount of over $55 million.  The terms of this "promissory note" are identical to the first $209 million "promissory note."

46.     On information and belief, this $55 million represents hundreds of withdrawals made by the Blixseths from YD to BGI between June 1, 2003, and December 31, 2005, mostly in increments of $50,000, $100,000, $200,000, and $250,000.  Many of these withdrawals were originally classified as "distributions" to BGI.

47.     In addition to the $55 million "promissory note," the Blixseths withdrew $7.8 million from YMC, memorialized in another promissory note bearing a date of September 30, 2005.

48.     In addition to the $55 million "promissory note" and the $7.8 million "promissory note," the Blixseths caused YMC to loan their company, YCW, over $908,000, which was memorialized in another promissory note bearing a date of September 30, 2005.

13

49. The $64.5 million of loans to BGI and/or YCW were made for the Blixseths' own personal benefit, and were improper distributions that violated the provisions of Article 7 of the Operating Agreements. These distributions, according to Article 7 of the Operating Agreements, were required to be allocated among the Yellowstone LLCs' Members *pro rata* in proportion to the Members' percentage ownership in the Yellowstone LLCs.

50. In sum, BGI and the Blixseths have received millions of dollars in distributions from the Yellowstone LLCs but the other equity owners of the Yellowstone LLCs have received nothing.

51. BGI's and the Blixseths' wrongful actions ultimately left the Yellowstone LLCs insolvent and without sufficient funds to pay their debts as they came due. As a result, on November 11, 2008, the Yellowstone LLCs were forced to seek Bankruptcy protection. Because of BGI's and the Blixseths' wrongful actions, in addition to not receiving the distributions to which they were rightfully entitled, the equity interests of the B Members are at risk of being completely eliminated as part of a reorganization plan of the Yellowstone LLCs.

## G.  BGI and Ms. Blixseth (and, on Information and Belief, Mr. Blixseth) Continue to Encumber Their Assets Such that the B Members will be Deprived of Any Meaningful Recovery from Them.

52. Because of other prior litigation relating to Class B member interests in the Yellowstone LLCs, BGI and the Blixseths are aware of the significant claims that B Members have against them.

53. With this knowledge, BGI and Ms. Blixseth (and, on information and belief, Mr. Blixseth) have continued to encumber their assets to pay personal expenses of the Blixseths.

54. Porcupine Creek is a 230.5 acre residential compound in Rancho Mirage, California. It is Ms. Blixseth's primary residence, but it is solely owned by BGI.

14

55.     As described above, $11.9 million of the improper distributions that were made to BGI and the Blixseths were used to pay off debt on the Blixseths' home at Porcupine Creek.

56.     Since August 2008, Ms. Blixseth has caused BGI to encumber Porcupine Creek and other BGI assets with liens to secure $49,425,545.46 of loans. $15,775,545.46 of these liens have been recorded since the Yellowstone LLCs filed bankruptcy.

57.     Plaintiffs are entitled to an order of this Court enjoining Defendants, temporarily, preliminarily and permanently, from further spending, transferring, concealing, dissipating, encumbering, assigning, and/or hypothecating their assets, including Porcupine Creek, absent further order of this Court.

## COUNT 1

### (Equitable Subordination Against BGI and Edra Blixseth)

58.     Plaintiffs incorporate by reference all prior allegations of this Complaint.

59.     As the manager and majority owner of the Yellowstone LLCs, BGI owes each of the Plaintiffs a fiduciary duty. Because the Blixseths together were the controlling shareholder of BGI, the Blixseths owed a fiduciary duty to each of the Plaintiffs. In addition, as officers of the Yellowstone LLCs, the Blixseths owed a fiduciary duty to each of the Plaintiffs. Moreover, BGI and Ms. Blixseth are insiders of the Debtors within the meaning of section 101(31) of Title 11.

60.     As alleged herein, BGI and Ms. Blixseth have acted inequitably and breached their fiduciary duties to Plaintiffs.

61.     BGI's and Edra Blixseth's inequitable conduct has resulted in injury to Plaintiffs and/or conferred an unfair advantage on BGI and Ms. Blixseth.

62.     Equitably subordinating BGI's and Ms. Blixseth's claims and interests is not inconsistent with the provisions of Title 11.

15

63.    Accordingly, pursuant to 11 U.S.C. § 510(c), any claim or interest of BGI and Ms. Blixseth with respect to the Debtors' estates should be equitably subordinated to the claims and interests of Plaintiffs.

### COUNT 2

### (Breach Of Contract Against BGI
For Receiving Improper Distributions)

64.    Plaintiffs incorporate by reference all the prior allegations of this Complaint.

65.    Article 7 of the Operating Agreements require that no Member has the right to a return of capital, but if such a return of capital is made, it must be made pro rata in proportion to a Member's percentage ownership in the respective Yellowstone LLC.

66.    As described above, BGI and the Blixseths provided BGI, a Member in both YD and YMC, with over $270 million as alleged "loans." BGI and the Blixseths used these funds for a variety of purposes unrelated to the Yellowstone LLCs, including, but not limited to, reducing debt on their real estate (for example, Porcupine Creek), purchasing resort properties for YCW, and purchasing other real and personal property for their own benefit. These amounts and assets constitute "distributions" as that term is found and understood in the Operating Agreements. No other Member received any portion of these distributions.

67.    BGI materially breached the Operating Agreements by taking distributions that were not appropriately allocated among BGI and Plaintiffs.

68.    As a direct and proximate consequence of BGI's material breach of contract, Plaintiffs are entitled to their pro rata share of the above-described distributions pursuant to the Operating Agreements and Mont. Code § 35-8-606.

69.    BGI's breach has caused Plaintiffs to be damaged in the amount of the pro rata distribution that they should have received.

16

## COUNT 3

### (Breach Of Contract Against BGI
### For Violating Plaintiffs' Right To Vote)

70.    Plaintiffs incorporate by reference all the prior allegations of this Complaint.

71.    Section 3.62 of the First Amendment to the Operating Agreement of YD states:

> Class A Members may not vote to decrease the ownership percentage
> interest of any Class B Member or substantially and materially alter the
> Class B rights or the business purpose of the Company without a two-
> thirds consent of Class B Members.

72.    The Operating Agreement of YMC contains the same provision.

73.    BGI and BFI are the sole Class A members of YD and YMC.

74.    Section 3.6.2 of the Operating Agreements provide that BGI cannot substantially

and materially alter the business purpose of the Yellowstone LLCs without first obtaining the

consent of two-thirds of the Class B members, including Plaintiffs.

75.    The Class B members have never voted on a proposal to alter the business

purpose of YD or YMC.

76.    BGI never sought any Class B member's consent to alter the business purpose of

YD or YMC.

77.    BGI and the Blixseths have substantially and materially altered the business

purpose of YD and YMC by, among other things, arranging for YD and YMC to make millions

of dollars of loans for the benefit of BGI, the Blixseths and YCW, and using YD and YMC to

purchase resort properties for YCW.

78.    As a direct and proximate consequence of BGI's material breach of contract,

Plaintiffs are entitled to damages in an amount to be determined at trial.

17

## COUNT 4

### (Tortious Interference With Contract Against The Blixseths)

79.     Plaintiffs incorporate by reference all the prior allegations of this Complaint.

80.     BGI had and continues to have valid and enforceable contractual obligations owing to Plaintiffs pursuant to the Operating Agreements.

81.     The Blixseths had, and still have, knowledge of BGI's contractual obligations owing to Plaintiffs.

82.     The Blixseths intentionally interfered and continue to interfere with BGI's contractual obligations to the detriment of Plaintiffs.

83.     The Blixseths were not and are not justified in interfering with BGI's contractual obligations.

84.     As a direct and proximate consequence of the Blixseths' actions and omissions, Plaintiffs are entitled to damages in an amount to be determined at trial.

## COUNT 5

### (Violation of Mont. Code § 35-8-310(2) Against BGI
### Violation Of Fiduciary Duty To Members Against BGI)

85.     Plaintiffs incorporate by reference all the prior allegations of this Complaint.

86.     Pursuant to Mont. Code § 35-8-310(2), BGI owes certain duties to Plaintiffs.

87.     BGI has violated Mont. Code § 35-8-310(2)(a), (b), and (c) with respect to both YD and YMC.

88.     BGI has not:

      (a)     accounted to the Yellowstone LLCs and held as trustee for them property, profit, and/or benefits derived by BGI in the conduct of the Yellowstone LLCs' business or derived from a use by BGI of the Yellowstone LLCs' property, including the appropriation of the Yellowstone LLCs' opportunities;

18

(b)     refrained from dealing with the Yellowstone LLCs in the conduct
of the Yellowstone LLCs' business on behalf of a party or as a
person having an interest adverse to the Yellowstone LLCs; and

(c)     refrained from competing with the Yellowstone LLCs in the
conduct of their business before the dissolution of the Yellowstone
LLCs.

89.     As a direct and proximate consequence of these Montana statutory violations,

Plaintiffs respectfully request that this Court enter a judgment that orders BGI to compensate

Plaintiffs for their damages in an amount to be determined at trial and order equitable relief as

described herein.

## COUNT 6

### (Violation Of Mont. Code § 35-8-310(3) Against BGI
### Violation Of Duty Of Care Owed To Members)

90.     Plaintiffs incorporate by reference all the prior allegations of this Complaint.

91.     BGI has engaged and continues to engage in grossly negligent conduct, reckless

conduct, intentional misconduct, and/or a knowing violation of law in the conduct of the

Yellowstone LLCs' business in violation of Mont. Code § 35-8-310(3).

92.     As a direct and proximate consequence of this Montana statutory violation,

Plaintiffs respectfully requests that this Court enter a judgment that orders BGI to compensate

Plaintiffs for their damages in an amount to be determined at trial and order equitable relief as

described herein.

## COUNT 7

### (Violation Of Mont. Code § 35-8-310(4) Against BGI
### Obligation Of Good Faith And Fair Dealing)

93.     Plaintiffs incorporate by reference all the prior allegations of this Complaint.

94.     BGI has failed to discharge its duties under Chapter 8 of the Montana Limited

Liability Company Act or the Yellowstone Operating Agreements, nor has it exercised its

19

alleged rights consistently with the obligation of good faith and fair dealing, all in violation of Mont. Code § 35-8-310(4).

95.     As a direct and proximate consequence of this Montana statutory violation, Plaintiffs respectfully requests that this Court enter a judgment that orders BGI to compensate Plaintiffs for their damages in an amount to be determined at trial and order equitable relief as described herein.

## COUNT 8

### (Common-law Breach Of Fiduciary Duty Against BGI)

96.     Plaintiffs incorporate by reference all the prior allegations of this Complaint.

97.     BGI owed and owes Plaintiffs a fiduciary duty.

98.     By its above-described actions and omissions, BGI has breached its fiduciary duty owing to Plaintiffs. Such breaches of fiduciary duty include, but are not limited to: (a) BGI's failure to disclose material facts to Plaintiffs throughout their relationship; and (b) BGI's failure to act in the best interests of Plaintiffs, particularly in connection with BGI's role and involvement in the "loans" from the Yellowstone LLCs which were actually distributions.

99.     As a direct and proximate consequence of BGI's breaches of fiduciary duty, Plaintiffs respectfully request that this Court enter a judgment that orders BGI to compensate Plaintiff for their damages in an amount to be determined at trial and order equitable relief as described herein.

## COUNT 9

### (Aiding And Abetting Against The Blixseths)

100.    Plaintiffs incorporate by reference all the prior allegations of this Complaint.

101.    The Blixseths knowingly participated in BGI's breaches of fiduciary duty.

20

102.     The Blixseths encouraged and affirmatively assisted BGI's breaches of fiduciary duty.

103.     The Blixseths helped BGI to conceal its breaches of fiduciary duty.

104.     The Blixseths aided and abetted BGI's breaches of fiduciary duty described herein.

105.     As a direct and proximate consequence of the Blixseths' actions and omissions, Plaintiffs are entitled to damages in an amount to be determined at trial.

## COUNT 10

### (The Blixseths Are Liable for the Actions of BGI)

106.     Plaintiffs incorporate by reference all the prior allegations of this Complaint.

107.     During all relevant times, BGI was the alter ego of the Blixseths, and the Blixseths were the alter ego of BGI. The Blixseths and BGI are one and the same.

108.     This Court should pierce the corporate veil of BGI and hold the Blixseths liable for BGI's conduct and debts, including any judgment which is entered in favor of Plaintiffs and against BGI in this action.

109.     Plaintiff is entitled to judgment against the Blixseths on all amounts and counts awarded against BGI.

## COUNT 11

### (Breach Of Fiduciary Duty Against The Blixseths)

110.     Plaintiffs incorporate by reference all the prior allegations of this Complaint.

111.     As the majority owners of the Yellowstone LLCs through their ownership of BGI and as officers of the Yellowstone LLCs, the Blixseths owed fiduciary duties to Plaintiffs to protect Plaintiffs' rights and interests in the Yellowstone LLCs, including Plaintiffs' rights to their pro rata share of distributions made by the Yellowstone LLCs.

21

112.    In particular, the Blixseths breached those duties in connection with the Credit

Suisse Loan by participating in the loan representing their own interests only, by intentionally

failing to disclose the Credit Suisse Loan and using improper distributions made to BGI for their

own personal interests, with a complete disregard for Plaintiffs' rights.

113.    As a direct and proximate consequence of the Blixseths' breaches of fiduciary

duty, Plaintiffs respectfully request that this Court enter a judgment that orders the Blixseths to

compensate Plaintiffs for their damages in an amount to be determined at trial and order

equitable relief as described herein.

**COUNT 12**

**(Conversion Against BGI And The Blixseths)**

114.    Plaintiffs incorporate by reference all the prior allegations of this Complaint.

115.    BGI and the Blixseths improperly converted distributions from the Yellowstone

LLCs that belonged to the B Members.

116.    In addition to BGI and the Blixseths returning to Plaintiffs their portion of the

funds improperly converted, Plaintiffs request a portion of any future lost income and profits

Plaintiffs suffered from BGI's and the Blixseths' conversion.

**COUNT 13**

**(Accounting Against BGI)**

117.    Plaintiffs incorporate by reference all the prior allegations of this Complaint.

118.    BGI, the Manager of the Yellowstone LLCs, has not provided Plaintiffs with an

accounting of all assets (including, without limitation, cash) expended and received by the

Yellowstone LLCs.

119.    Plaintiffs respectfully request that this Court order an accounting of such funds as

permitted under Mont. Code §§ 35-8-405 and 35-8-410.

22

## COUNT 14

### (Unjust Enrichment Against All Defendants)

120.    Plaintiffs incorporate by reference all the prior allegations of this Complaint.

121.    As a result of their above-described actions and omissions, Defendants have been unjustly enriched, and Plaintiffs have been unjustly injured, in an amount in excess of Fifty Thousand Dollars ($50,000).

122.    In addition, as a result of the above-described actions and omissions, Defendants would be unjustly enriched at the expense of Plaintiffs and to Plaintiffs' detriment if Defendants were allowed to continue to use the economic benefits of the distributions that should have been made to Plaintiffs.

123.    Plaintiffs request that the Court accordingly impose a constructive trust over all real and personal property that have benefited or profited from, or have been acquired or maintained with, the unlawful distributions.

## COUNT 15

### (Accounting And Constructive Trust Against All Defendants)

124.    Plaintiffs incorporate by reference all the prior allegations of this Complaint.

125.    Plaintiffs are entitled to a detailed accounting with respect to any and all distributions that were unlawfully made.

126.    Plaintiffs are entitled to a constructive trust with respect to any and all distributions that were unlawfully made.  Plaintiffs are entitled not only to what they lost by not receiving their proportionate share of such distribution but all of the gains received by Defendants from the unlawful distributions.

127.    Under these circumstances, the Court has the authority and equitable power to impose a constructive trust over all real and personal property that have benefited or profited

23

from, or have been acquired or maintained with, the unlawful distributions, including, but not limited to, Porcupine Creek, Chateau de Farcheville, Tamarindo, the island in Turks & Caicos and the property in St. Andrews, Scotland.

### Count 16

#### (Injunctive/Equitable Relief Against All Defendants)

128.    Plaintiffs incorporate by reference all the prior allegations of this Complaint.

129.    Plaintiffs are entitled to temporary and permanent injunctive relief and other appropriate equitable relief pursuant to Montana statutory and common law.  In particular, Plaintiffs are entitled to equitable liens on all real property that has been acquired or maintained with, the unlawful distributions, including, but not limited to, Porcupine Creek, Chateau de Farcheville, Tamarindo, the island in Turks & Caicos and the property in St. Andrews, Scotland.

### Count 17

#### (Conspiracy Against All Defendants)

130.    Plaintiffs incorporate by reference all the prior allegations of this Complaint.

131.    By their above-described actions and omissions, Defendants have knowingly or tacitly conspired together to deprive Plaintiffs of their rights under the Operating Agreements, and Montana statutes and common law.

132.    As a direct and proximate consequence of Defendants' actions and omissions, Plaintiffs are entitled to damages in an amount to be determined at trial.

### COUNT 18

#### (Request For Attorneys' Fees Against BGI)

133.    Plaintiffs incorporate by reference all the prior allegations of this Complaint.

134.    Section 10.2 of the Yellowstone LLCs' Operating Agreements provide that BGI may be liable for violations of the Montana Limited Liability Company Act.  To the extent that

BGI violated any section of the Montana Limited Liability Company Act, it has therefore breached the Operating Agreements.

135.    Paragraph 12.2 of the Yellowstone LLCs' Operating Agreements provide:

> Attorneys Fees.  If suit, action, or other proceeding of any nature whatsoever (including any proceeding under the U.S. Bankruptcy Code) is instituted in connection with any controversy arising out of this Agreement, or to interpret or enforce any rights hereunder, the prevailing party shall be entitled to recover its attorney fees, paralegals, accountants, and other experts' fees, and all other fees, costs, and expenses actually incurred and reasonably necessary in connection therewith, as determined by the arbitrator or court at trial or on any appeal or review, in addition to all other amounts provided by law.

136.    Plaintiffs' claims for relief are in connection with a controversy arising out of the Operating Agreements and are brought to enforce Plaintiff's rights against BGI thereunder.  As such, Plaintiffs are entitled to their fees, costs, and expenses as detailed in the Operating Agreements.

## COUNT 19

### (Request For Punitive Damages Against BGI And The Blixseths)

137.    Plaintiffs incorporate by reference all the prior allegations of this Complaint.

138.    Pursuant to Mont. Code § 27-1-221(1), reasonable punitive damages may be awarded when the defendant has been found guilty of actual fraud or actual malice.  Pursuant to Mont. Code § 27-1-221(2), a defendant is guilty of actual malice if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the plaintiff and:  (a) deliberately proceeds to act in conscious or intentional disregard of the high probability of injury to the plaintiff; or (b) deliberately proceeds to act with indifference to the high probability of injury to the plaintiff.

139.    As alleged herein, BGI and the Blixseths are guilty of actual malice because they have, and had, knowledge of facts and/or intentionally disregarded facts that created a high

25

probability of injury to Plaintiffs and: (a) deliberately proceeded to act and continue to act in conscious or intentional disregard of the high probability of injury to Plaintiffs; and/or (b) deliberately proceeded to act and continue to act with indifference to the high probability of injury to Plaintiffs.

140.    As alleged herein, because BGI and the Blixseths, with full knowledge of Plaintiffs' rights and interest in the Yellowstone LLCs, acted in direct derogation of those rights, and through their unlawful and malicious acts took assets and funds belonging to Plaintiffs, and they have deliberately and willfully acted and continue to act with conscious or intentional disregard of the high probability of injury to Plaintiffs and/or deliberately proceeded to act with indifference to the high probability of injury to Plaintiffs.

141.    Plaintiffs respectfully requests punitive damages only with respect to their claims for relief relating to BGI's Montana statutory violations, Plaintiffs' tortious interference count against the Blixseths, Plaintiffs' count against BGI for its common-law breach of fiduciary duty, and their counts against the Blixseths.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that this Court enter judgment upon its Complaint, jointly and severally, against Defendants as follows:

1.    An Order equitably subordinating BGI's and Edra Blixseth's claims and interests with respect to the Debtors' estates to the claims and interests of Plaintiffs;

2.    An award of actual damages in an amount to be determined at trial;

3.    An Order requiring Defendants to pay to Plaintiffs their proportionate share of the distributions that Defendants wrongfully diverted from Plaintiffs, plus interest, and any and all profits or gain they received from the use of Plaintiffs' distributions;

26

4.   An accounting, constructive trust and recoupment of all the distributions that
Defendants improperly diverted from Plaintiffs, plus interest, including a
constructive trust over Porcupine Creek, Chateau de Farcheville, Tamarindo, the
island in Turks & Caicos and the property in St. Andrews, Scotland;

5.   Temporary and permanent equitable and injunctive relief as deemed appropriate
during the course of the litigation;

6.   An award of costs, disbursements, attorneys' fees and prejudgment interest, as
permitted by the Operating Agreements, and Montana statutory and common law;

7.   An award of punitive damages; and

8.   Such other and further relief as the Court deems just and equitable.

DATED this 3rd day of March 2009.             **ANTHONY OSTLUND BAER
                                              & LOUWAGIE P.A.**

                                              By:  /s/Joseph W. Anthony
                                                   Joseph W. Anthony (MN #2872)
                                                   Mary L. Knoblauch (MN #159645
                                              90 South Seventh Street, Suite 3600
                                              Minneapolis, MN  55402
                                              Telephone:  612-349-6969
                                              Facsimile:  612-349-6996
                                              Email: janthony@aoblaw.com
                                                     mknoblauch@aoblaw.com

                                                /s/ Ronald A. Bender
                                              RONALD A. BENDER (MT #106)
                                              MATTHEW J. CUFFE (MT #4448)
                                              **WORDEN THANE P.C.**
                                              Attorneys at Law
                                              P.O. Box 4747
                                              Missoula, MT  59806
                                              Telephone:  (406) 721-3400
                                              Facsimile:  (406) 721-6985
                                              Email:  rbender@wthlaw.net
                                                      mcuffe@wthlaw.net

                                              ATTORNEYS FOR AD HOC GROUP OF
                                              CLASS B UNIT HOLDERS

27